KRISTA GREEN
Plaintiff, Pro Se
127 South 5th Street
Montpelier, Idaho 83254
Telephone: (208) 399-2064

U.S. COURTS
JAN 22 2019
Rcvd_____Filed____Time 3:33p
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO, POCATELLO DIVISION

| | |
|---|---|
| KRISTA GREEN, | |
| Plaintiff, | CIVIL COMPLAINT & DEMAND FOR JURY TRIAL |
| vs. | Case No. |
| W.L. GORE & ASSOCIATES, INC. A Delaware Corporation, registered to do business in Idaho, and JOHN DOES 1-100, | |
| Defendant. | |

Plaintiff, Krista Green, appearing Pro Se, hereby complains of the Defendant, W.L. Gore & Associates, Inc., and John Does 1-100 as follows:

## PARTIES

1. Plaintiff, KRISTA GREEN, is a resident of Bear Lake County, in the State of Idaho.

2. Defendant, W.L. GORE & ASSOCIATES, INC. is a Delaware Corporation in good standing, doing business in the State of Idaho.

3. Plaintiff is without sufficient information to specifically identify those persons fictitiously named herein as John Does 1-100. Plaintiff reserves the right to amend this Complaint to specifically identify those defendants, once their identities become known. Plaintiff alleges that John Does 1-100 were other manufacturing or design companies who may have helped in the design or manufacturing of the GORE-TEX DualMesh EMERGE PLUS Biomaterial, (also known as a Hernia Mesh).

## INTRODUCTION

4.     The GORE-TEX DualMesh EMERGE PLUS Biomaterial consists of an ePTFE mesh coated with silver carbonate and chlorhexidine diacetate and a silicone component attached to the closed microstructure side of the ePTFE component with a silicone adhesive.

5.     The silicone component is designed to provide a stiffening effect to the ePTFE component thereby making the ePTFE material more rigid and improving its handling characteristics. The silicone component provides both stiffness and easier unrolling in order to aid in placement and fixation of the ePTFE component.

6.     In August of 2003, W.L. Gore & Associates, Inc. was granted a special 510(k) premarket notification based on the data and information presented that had numerous similarities to support a determination of substantial equivalence, and therefore market clearance was granted by the Department of Health & Human Services, Food and Drug Administration, Office of Device Evaluation.

7.     Due to the multiple complications of the Hernia Mesh devices, the FDA later recalled this product and suggested removal of the implanted Hernia Mesh from patients.

8.     The complaints and complications caused by the Hernia Mesh are physical pain and suffering; adhesion; intestinal fistulas; migration of the mesh; scarring; recurrence of the hernia; blockages/obstruction of the small and/or large intestines; perforations; lesions; infections; swelling and failure of the hernia mesh.

## JURISDICTION AND VENUE

9. The incident complained of in this action and the damages arising from this device were discovered on or about January 30, 2018, in Salt Lake County, Utah, but the Hernia Mesh was implanted into the Plaintiff on September 11, 2006, in Bear Lake County, Idaho.

10. This Court has jurisdiction pursuant to 28 U.S.C. §1332(a).

11. Venue is proper in this Court pursuant to 28 U.S.C. §1391.

## GENERAL ALLEGATIONS

12. Plaintiff reaffirms and realleges all preceding paragraphs as if more fully set forth herein.

13. Plaintiff was a healthy twenty-four (24) year old mother of two when she received the Gore-Tex Dual Mesh on September 11, 2006.

14. Plaintiff received the Mesh due to an appendectomy with an incisional hernia through her right lower quadrant incision from a prior surgery. *See Exhibit "A"* Bear Lake Memorial Hospital Operative Note.

15. Since the time of the hernia mesh implant, Plaintiff experienced excessive pain, burning, pulling and swelling from the surgery. *See Exhibit "B"* Photos of the Gore-Tex Dual Mess implanted with metal tacks.

16. In 2012, Petitioner was pregnant with her third child. The baby was delivered normally, but mysteriously died nine weeks later.

17. In 2014, Plaintiff was diagnosed with uterine cancer and received a hysterectomy.

18. On November 30, 2017, Plaintiff received a CT scan of her abdomen and pelvis. The CT report showed the Mesh was present in the anterior right pelvis and there was a ventral bulging at the site of the Mesh. A lobulated right renal lesion also appeared on

the CT scan. On January 30, 2018, Plaintiff was sent to surgery to remove the recalled Gore-Tex Dual Mesh. The preoperative diagnosis was recurrent right lower quadrant incisional hernia with mesh and partial small bowel obstruction symptoms. The postoperative diagnosis was the same.

19. There was adhesions to the viscera as well as to the abdominal wall involving the mesh at the right lower quadrant involving the small bowel and large bowel. The hernia mesh was then removed, which was noted that it was well incorporated. ***See Exhibit "C"*** Photos of the removal of the Gore-Tex Dual Mesh.

20. At this time, Plaintiff may be required to undergo future surgery on the area the hernia mesh was placed, together with surgery for her lesions on her Kidney.

## FIRST CAUSE OF ACTION
### (Strict Liability)

21. Plaintiff reaffirms and realleges all proceeding paragraphs, as if fully set forth herein.

22. Plaintiff is in the class of persons that the Defendants should reasonably foresee as being subject to the harm caused by defectively designed Gore-Tex Dual Mesh insofar as Plaintiff was the type of person for whom the Gore-Tex Dual Mesh was intended to be used.

23. Defendants, which are engaged in the business of selling the products, manufactured and supplied Gore-Tex Dual Mesh and placed them into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceed the benefits associated with the design and/or formulation of the products.

24. The Gore-Tex Dual Mesh supplied to Plaintiff was defective in design and formulation and unreasonably dangerous when they left the hands of Defendants,

the manufacturers and suppliers, and they reached the user and consumer of the products, Plaintiff, without substantial alteration in the condition in which they were sold.

25. The Gore-Tex Dual Mesh manufactured by Defendants were unreasonable and dangerously defective beyond the extent contemplated by ordinary patients with ordinary knowledge regarding these products.

26. Defendants' Gore-Tex Dual Mesh were defective due to inadequate warning and/or inadequate clinical trials, *in vivo* and *in vitro* testing and study, and inadequate reporting regarding the results of such studies.

27. Defendants' Gore-Tex Dual Mesh were defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of injury from their Gore-Tex Dual Mesh, they failed to provide adequate warnings to the medical community and patients, and continued to promote the product as safe and effective.

28. The products defects alleged above were a substantial contributing cause of the injuries suffered by Plaintiff. Plaintiff has suffered severe pain and discomfort, swelling, infections, bowel obstructions, lesions on the Kidney, hysterectomy and the possible death of her infant daughter. Plaintiff has suffered mental distress and anguish. Plaintiff has suffered lost wages and lost earning capacity.

29. Plaintiff will also require future medical care.

30. WHEREFORE, Plaintiff prays for judgment against the Defendants, jointly and severally, for Ten Million Dollars ($10,000,000) compensatory damages, plus interest, costs and attorneys' fees.

## SECOND CAUSE OF ACTION
### (Strict Products Liability: FAILURE TO WARN)

31. Plaintiff reaffirms and realleges all proceeding paragraphs, as if fully set forth herein.

32. Defendants manufactured the Gore-Tex Dual Mesh and placed them into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the products.

33. Defendants Gore-Tex Dual Mesh were defective due to inadequate warning and/or adequate clinical trials, *in vivo* and *in vitro* testing and study, and inadequate reporting regarding the results.

34. Defendants Gore-Tex Dual Mesh were defective due to inadequate post-marketing warning or instruction because, after Defendants knew or should have known of the risk of injury from the Gore-Tex Dual Mesh, they failed to provide adequate warnings to the medical community and patients, and continued to promote the Gore-Tex Dual Mesh as safe and effective.

35. As the direct and proximate cause of the Defendants' negligence, Plaintiff will require future medical care and surgeries. Plaintiff has suffered lost wages, lost earning capacity, mental distress and anguish, and other damages.

36. WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, for Ten Million Dollars ($10,000,00) compensatory damages, plus interest, costs and attorneys' fees.

## THIRD CAUSE OF ACTION
### (Negligence)

37. Plaintiff reaffirms and realleges all proceeding paragraphs, as if fully set forth herein.

38. Defendants owed a duty to Plaintiff to provide a Hernia Mesh in accordance with applicable industry and manufacturing standards.

39. Defendants breached this duty to Plaintiff by producing a substandard, defective and unsafe Hernia Mesh with design or manufacturing defects.

40. As a direct and proximate result of the negligence of Defendants, the Plaintiff was physically and emotionally damaged. Plaintiff prays for judgment against Defendants, jointly and severally, for Ten Million Dollars ($10,000,00) compensatory damages, plus interest, costs and attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

A. On its first cause of action, damages in the amount of at least $10,000,000.

B. On its second cause of action, damages in the amount of at least $10,000,000.

C. On its third cause of action, damages in the amount of at least $10,000,000.

D. Reasonable costs incurred in prosecuting this action, including attorney fees; and

E. Such other relief as this Court deems appropriate.

DATED this ___ day of January 15, 2019.

_____
[signature]

**Plaintiff's Address:**

127 South 5th Street
Montpelier, Idaho 83254

# EXHIBIT "A"

**Bear Lake Memorial Hospital**
164 South 5th
Montpelier, Idaho 83254
Tel: (208) 847-1630
Fax: (208) 847-2201

## OPERATIVE NOTE

**PATIENT NAME:** WIDDISON KRISTA L          S. Bender, MD
**DOB:** ▮▮▮▮1982
**PT #:** ▮▮▮8252
**MR #:** ▮▮▮8971

**DATE:** 09/11/06

**NAME OF SURGERY:** Laparoscopic incisional hernia repair with mesh.

**PREOPERATIVE DIAGNOSIS:** Incisional hernia.

**POSTOPERATIVE DIAGNOSIS:** Same.

**ANESTHESIA:** General by Dorian Grunig, CRNA.
**SURGEON:** Scott Bender, MD.
**ASSISTANT SURGEON:** Dr. Clay Campbell.
**ESTIMATED BLOOD LOSS:** Approximately 100cc.
**IV FLUIDS GIVEN:** 1500cc lactated Ringer's.
**DRAINS:** None.
**COMPLICATIONS:** None.

**OPERATIVE INDICATIONS:** The patient is a 24-year-old woman who presents one year after open appendectomy with an incisional hernia through her right lower quadrant incision. She is significantly overweight, with a body weight of approximately 280 pounds and a height of 5' 5". We discussed the risks and benefits and alternatives to procedure and after full informed consent she was brought to the operating room.

**OPERATIVE TECHNIQUE:** The patient was placed in a comfortable supine position on the operating table. She was endotracheal intubated and general anesthetic was administered. Thigh high TED stockings and compression devices were placed by the nurses as DVT prophylaxis. The abdomen was then shaved and prepped and draped in the usual sterile manner after the nurses inserted a Foley catheter. A 2cm incision was made through the supraumbilical skin fold and deep in through the subcutaneous tissues, fascia and peritoneum under direct vision. We placed a Hasson canula into the peritoneal cavity. It was then inflated with $CO_2$ gas to a pressure of 15mm mercury and diagnostic laparoscopy was carried out.

Continued Page 2.

Page 2.

PATIENT NAME: WIDDISON KRISTA L    S. Bender, MD
DOB: ▮▮/1982
PT #: ▮8252
MR #: ▮8971

DATE: 09/11/06

First, it was noted there was no injury to any of the intraabdominal organs or blood vessels during this procedure of gaining access to the peritoneal cavity and creating the pneumoperitoneum. Next, under direct vision two 5mm Trocars were placed, one in the suprapubic area and one in the right upper quadrant area. There were adhesions of the omentum to the hernia area. This was taken down with cautery and laparoscopic scissors. We measured the hernia defect and saw that it measured approximately 8cm x 11cm. We custom tailored a gortex dual mesh truss to overlap this defect by 3cm circumferentially. We placed 0-Prolene sutures on each of the corners, rolled the mesh and placed it into the peritoneal cavity using a no-touch technique. We unfurled the mesh. We used a gortex suture passer to make a small nick in the skin at the four corners, corresponding to the four corners on the mesh, and we grasped the previously tied 0-Prolene sutures over a fascial bridge and tied them down securely. We were happy that the mesh covered the hernia defects well, and was not redundant or too tight. We then placed four additionally placed 0-Prolene sutures between the previous marks, to completely secure the mesh in eight different locations with the 0-Prolene sutures in an identical manner. We had good coverage of all the areas we wanted to cover. The brown side of the mesh was down. The corduroy side was up against the abdominal wall. In addition, we overlapped the right internal ring area where there was dilated opening which could have caused a hernia in the future. We then used a tacker device at 1-2cm intervals to anchor the edge of the mesh up so that it could not adhere to the bowel and/or bowel could not slip up underneath it. Being satisfied with this and inspecting all the operative areas, there was no bleeding identified from operative area or from the trocar sites. As we removed the trocars, we then removed the gas completely from the abdomen. The wounds were closed in layers with absorbable sutures, Steri-Strips were placed occlusive dressings were placed and the final sponge and needle count was correct x 2. The patient was awakened from the anesthetic, extubated and transferred to the recovery area in good condition by the surgeon and anesthesiologist.

POSTOPERATIVE PLAN: Respiratory prophylaxis, close observation and early ambulation.

_____
S. Bender, MD

D: 09/11/06
T: 09/11/06/rrw

COPY: Dr. Campbell.